**KOEHRING COMPANY, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. A. No. 71–C–401.**

United States District Court, E. D. Wisconsin.

June 3, 1977.

David S. Lott and Steven E. Keane, Foley & Lardner, Milwaukee, Wis., for plaintiff.

Thomas R. Jones, Refund Trial Section I, U.S. Dept. of Justice, Washington, D.C., for defendant.

## MEMORANDUM AND ORDER

WARREN, District Judge.

This case is a taxpayer's suit for refund of income taxes paid under protest in the amount of $412,840.47 plus interest for the fiscal year ended November 30, 1964.

The central question, involving one of the most complex parts of the Internal Revenue Code, is whether or not Koehring Overseas Corporation, S.A. ("KOS") was, during the year in question, a Controlled Foreign Corporation within the meaning of § 957 of the Internal Revenue Code of 1954 as amended. If found to be such, plaintiff would be subject to tax upon its pro rata share of the so-called subpart F income of KOS for 1964.

Plaintiff filed consolidated federal income tax returns for the fiscal year ending November 30, 1964. The IRS notified the plaintiff of the proposed assessment of $412,840.47 in additional taxes upon the finding that KOS was a Controlled Foreign Corporation. Plaintiff timely protested; a hearing was conducted before the Appellate Division of the IRS in Milwaukee; and the proposed assessment was upheld at that level.

Plaintiff paid the deficiency and filed a claim for refund. The claim was denied and this suit was commenced July 30, 1971.

The case languished for a considerable period because of the crowded docket situation in the Eastern District of Wisconsin. Ultimately the matter was tried to the Court commencing May 6, 1975.

## FINDINGS OF FACT

1. Plaintiff, Koehring Corporation, is a Wisconsin corporation having its principal office in Milwaukee. It is a manufacturer of heavy construction equipment with worldwide sales. It has various divisions and subsidiaries located throughout the United States and the world.

2. In 1959 Koehring acquired a Panamanian corporation called Star Drilling International. It evolved into *Koehring Overseas Corporation,* a wholly-owned subsidiary, which conducted overseas marketing of Koehring products in the Western Hemisphere. Prior to September 2, 1963, KOS had 26,000 shares of common stock at $10 par value, all owned by Koehring. KOS never had offices in Panama. It had been managed from Milwaukee, but, effective September 1, 1963, its offices and all personnel were headquartered in San Juan, Puerto Rico.

3. *Koehring-Waterous* is a wholly-owned Canadian subsidiary of Koehring which manufactures paper mill machinery and construction equipment.

4. In 1962 Koehring acquired 55 percent of the stock of a French corporation called Brissonneau & Lotz. It was thereafter renamed *Koehring Brissonneau* and engaged in the business of marketing Koehring products in France and other parts of Europe.

5. *Ishikawajima-Koehring Company* is a Japanese corporation which sold Koehring products in the Japanese and surrounding markets. It was owned 25 percent by Koehring and 75 percent by Ishikawajima Heavy Industries of Japan.

6. *Newton-Chambers & Co., Ltd.* is a British manufacturer of heavy equipment located in Sheffield, England. It was the parent of a group of enterprises known as the Newton-Chambers Group. Sir Peter Roberts was Chairman of Newton-Chambers. P. J. C. Bovill was managing director until January 1964, and then was succeeded by S. L. Waide. Newton-Chambers had various subsidiaries for marketing and specialized purposes.

7. *Ransomes & Rapier, Ltd* of Ipswich, England, was a wholly-owned subsidiary of Newton-Chambers which was acquired in 1958. It engaged principally in the manufacture of sluice gates and heavy construction equipment.

8. *NCK-Rapier, Ltd,* was likewise a Newton-Chambers subsidiary which did no manufacturing but marketed the products manufactured by the Newton-Chambers group of companies abroad.

9. After World War II, Koehring and Newton-Chambers developed mutual business ties and on August 17, 1948, executed a licensing agreement under which Newton-Chambers manufactured and sold products of Koehring design under a licensing arrangement. The agreement called for Koehring's marketing area to be the Western Hemisphere; Newton-Chambers was to sell in the Eastern Hemisphere with an emphasis in defined areas of Europe and the Near and Far East.

In the period around 1960–1961, when both Koehring and Newton-Chambers had acquired some experience in their efforts at world wide sales, there was a reassessment of the sales situation in terms of both the line of product and the geographical territories of each participant. Newton-Chambers had no interest in pushing certain Koehring products, and Koehring felt that Newton-Chambers was not sufficiently aggressive in certain areas. Koehring's dissatisfaction with the performance of its sales partner was such that over the period of the license agreement, Newton-Chambers surrendered territory in the Far East to the *Ishikawajima-Koehring Co.* and various discussions were held between Koehring executives and Newton-Chambers on how to improve the international market.

10. In the period 1957–62, the principals on several occasions discussed setting up an international sales corporation to handle the entire line of all foreign markets. A proposal to create a cooperative sales venture involving Koehring, Newton-Chambers, Ransomes & Rapier, and Wingate was advanced but never put into effect.

11. In 1962 Koehring acquired Brissonneau & Lotz and began to market Koehring products in Europe in the territory heretofore assigned to Newton-Chambers. This action stimulated a protest by Sir Peter Roberts and a suggestion that Newton-Chambers would like to have an equity position in KOS so as to participate in the overseas marketing of Koehring products.

12. During this same period, there was a general recognition by the executives of Koehring and Newton-Chambers that (1) Newton-Chambers was not being aggressive enough in selling Koehring products in Europe and Africa; (2) KOS was not being aggressive enough in selling Newton-Chambers products in the Western Hemisphere; (3) Koehring income from license fees could be substantially increased if Newton-Chambers' sales of Koehring products in Europe and Africa could be increased; (4) some sort of jointly-owned sales company could be helpful in these regards.

13. After Koehring-Brissonneau began selling Koehring products in European territory that had previously been Newton-Chambers' area, Sir Peter Roberts received a legal opinion that Koehring's action constituted a breach of the 1948 licensing agreement. But rather than resort to legal relief, Sir Roberts sent a formal letter of protest and, on May 15, 1962, wrote to Julian Steelman, President of Koehring, contending that Newton-Chambers was "somewhat worried about the discussions re your arrangements on the continent" and that he had "reservations about the infringement upon N.C.'s activities, by the operation of K-B." He suggested that Newton-Chambers "should have an equity stake in Koehring's overseas ventures" and that KOS should be the means of coordinating the "international impact of Koehring."

14. During 1962, the provisions of the Revenue Act of 1962 establishing provisions regarding foreign-controlled corporations were under consideration in Congress. The matter was of concern to Koehring officials and that was expressed to members of Congress. However, in October, 1962, Congress enacted § 957 of the Internal Revenue Code relating to Controlled Foreign Corporations. The law commenced the taxation of a U.S. stockholders' pro rata share of the controlled foreign corporation for tax years beginning after December 31, 1962. KOS was on a fiscal year ending November 30 and hence its status became critical as of November 30, 1963. After passage of the Act, Koehring had a strong tax avoidance motivation that coincided with the then current marketing concerns of Koehring and Newton-Chambers.

15. For the fiscal year ending November 30, 1963, KOS paid $9,521 in income taxes to Puerto Rico. Its total after tax income that year was $525,456.00. For the fiscal year ending November 30, 1964, KOS paid Puerto Rico income taxes of $24,278. Its total after tax income that year was $858,093.00. Its retained surplus at the end of that year was $2,400,000.

16. In the spring and summer of 1963, Koehring and Newton-Chambers discussed various cross-investment plans. By July 15, 1963, matters had matured to the point where Newton-Chambers applied to the Bank of England for the requisite monetary approval. In the application Newton-Chambers indicated that authorized capital of KOS would be increased to $800,000 divided as follows:

| | | |
|---|---|---|
| Common Stock | $360,000 | 45% |
| 8% Preferred Stock | $440,000 | 55% |

Each share of stock, common and preferred, was to have one vote. On September 1, 1963 Newton-Chambers was to acquire the eight percent preferred stock for $400,000 with a right of redemption thereon at premium after June 30, 1968. In December, 1963 Koehring-Waterous, the Canadian subsidiary of Koehring Corporation, was to purchase for $400,000 a newly authorized issue of 143,000 five percent redeemable non-voting preference shares in Ransomes & Rapier, Ltd., the Newton-Chambers subsidiary. In urging approval, the Newton-Chambers management noted that no export of sterling was involved and Newton-Chambers would be receiving more interest than it paid.

17. In August, 1963, Koehring discovered that Panamanian law prohibited the sale of stock of a domestic corporation at less than par value. This required that $440,000 would have to be paid for the KOS stock. This was provided by increasing the amount which Koehring-Waterous was to invest in Ransomes & Rapiers, Ltd. to $440,000.

18. In the period from August 29, 1963 to April 1965, the above-described cross-investment was accomplished. Furthermore, during this period, Koehring purchased 325,600 newly-issued shares of Ransomes & Rapier, Ltd. for 857,000 pounds sterling, being approximately $2,400,000. It also purchased for 63,272 pounds 100,000 five percent cumulative non-voting preferred shares of Ransomes & Rapier which had been previously held by Newton-Chambers.

19. After the rather complex flow of funds summarized above had been completed, Newton-Chambers held 44,000 cumulative voting preferred shares of KOS representing 55 percent of the stock entitled to vote; Koehring held 36,000 voting shares of common stock of KOS, this being 45 percent of the shares entitled to vote.

In addition, Koehring held 40 percent of the common voting stock of Ransomes & Rapier Ltd. and 100,000 five-percent non-voting cumulative preferred shares of the same company. Koehring-Waterous held 143,000 shares of five percent non-voting redeemable second preference shares of Newton-Chambers. Newton-Chambers group had received a capital infusion of $2,577,161.

20. In September 1963, a new Board of Directors for KOS was constituted. Three identified with Newton-Chambers and two with Koehring. In January 1964, Sir Peter Roberts assumed the chairmanship with the ratio unchanged. This was the fruition of a plan which Julius Steelman and Sir Peter Roberts had discussed in February 1963. From October 25, 1963 through November 1967, the Board held ten meetings and there were two stockholders meetings. Of the ten directors' meetings, no Newton-Chambers directors participated in six (including one which aborted for lack of a quorum; of

the two stockholders meetings one was adjourned for lack of a quorum and no Newton-Chambers representatives attended the other. It is clearly not the record of a dynamic vibrant joint international sales organization with the dominant Newton-Chambers directors busily fructifying the labors of their respective manufacturing groups. Of the four directors' meetings which Newton-Chambers directors attended, one was the meeting at which Sir Peter Roberts became Chairman. At each of the others the primary action was of a passive nature consistent with the contention of the government that KOS was an instrumentality of Koehring rather than a joint sales corporation. The actions of the Newton-Chambers directors were such as would be expected of sham directors whose real interest lay in protecting the Newton-Chambers stake in KOS. On April 1, 1965, Sir Peter Roberts urged that KOS keep $440,000 in the bank to protect the preferred shareholder's investment. On September 16, 1966, Sir Peter Roberts acquiesced in surrendering to Koehring-Brissonneau the European territory and former non-British African colony territory. In November 1967, the Newton-Chambers directors successfully opposed declaring a dividend on common stock.

21. Newton-Chambers was to be able to withdraw with one year's notice. No Newton-Chambers employees were authorized to withdraw KOS funds. There were no employee changes after Newton-Chambers acquired its 55 percent of the stock. KOS continued to sell only Koehring manufactured products until 1967. There were no sales of Newton-Chambers manufactured products by KOS during this period. In the prospectus describing the KOS stock issue, it was noted that KOS had not paid any cash dividends; that any accumulations would be utilized outside the United States; and that no dividends would be paid "for the next several years." The record does not disclose that KOS ever declared a dividend on its earnings.

The Newton-Chambers annual report for 1963 noted that:

2. By reason of the fact that the interest of Newton Chambers & Co. Ltd. in the assets of Koehring Overseas Corporation is limited to the nominal value of the stock held, and in the income, to the fixed cumulative dividend of 8%, the Directors are of the opinion that it would be misleading to include the accounts of that company in the consolidated accounts of the Group.

22. Although Newton-Chambers owned 55 percent of the voting stock of a corporation with retained earnings of $1,500,000 in 1963 and earnings of $800,000 plus in 1964, its only returns were eight percent on the investment of $440,000 or $35,200 a year. While this may have been a good return based on the then current market, it was certainly not the kind of take-out to be expected of one owning control of such an asset. The record clearly shows that Newton-Chambers considered their function in KOS to be one of providing "nominal control" with the main objective in their own words to be "assisting Koehring with its tax problems."

The quid pro quo for this activity by Sir Peter Roberts and Newton-Chambers was a good eight percent return on $440,000, but more importantly, the infusion of substantial new cash into the Newton-Chambers group.

Koehring financed the $440,000 cross-investment and the transaction was primarily generated by a strong tax avoidance purpose on the part of Koehring.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction of the parties and the subject matter of this action.

2. The sole issue presented to the Court in this action is whether or not Koehring Overseas Corporation was a Controlled Foreign Corporation within the meaning of § 957 of the Internal Revenue Code during the fiscal year of Koehring ending November 30, 1964.

3. Sec. 957(a) of the Internal Revenue Code provides that the term "Controlled Foreign Corporation" means any foreign corporation of which more than 50 percent of the total combined voting power of all classes of stock entitled to vote is owned, or is considered as owned by United States shareholders upon any day during the taxable year of such foreign corporation.

4. If the corporation in question is a Controlled Foreign Corporation, § 951 of the Codes provides that a United States shareholder's pro rata share of the Subpart F income of the Controlled Foreign Corporation is to be included in the income of that United States shareholder as a dividend deemed paid in money on the last day of the taxable year of the Controlled Foreign Corporation.

5. Koehring is a United States shareholder within the meaning of § 951(b) of the Code; the income of the Koehring Overseas Corporation is Subpart F income.

6. The question as to whether or not a corporation is a Controlled Foreign Corporation hinges upon the ownership of voting *power*. The Internal Revenue Service has promulgated and properly adopted Treasury Regulation § 1–1.957–2 construing Sec. 957 which reads:

(2) Shifting of formal voting power. Any arrangement to shift formal voting power away from United States shareholders of a foreign corporation will not be given effect if in reality voting power is retained. The mere ownership of stock entitled to vote does not by itself mean that the shareholder owning such stock has the voting power of such stock for purposes of section 957. For example, if there is any agreement, whether express or implied, that any shareholder will not vote his stock or will vote it only in a specified manner, or that shareholders owning stock having not more than 50 percent of the total combined voting power will exercise voting power normally possessed by a majority of stockholders, then the nominal ownership of the voting power will be disregarded in determining which shareholders actually hold such voting power, and this determination will be made on the basis of such agreement. Moreover, where United States share-

holders own shares of one or more classes of stock of a foreign corporation which has another class of stock outstanding, the voting power ostensibly provided such other class of stock will be deemed owned by any person or persons on whose behalf it is exercised or, if not exercised, will be disregarded if the percentage of voting power of such other class of stock is substantially greater than its proportionate share of the corporate earnings, if the facts indicate that the shareholders of such other class of stock do not exercise their voting rights independently or fail to exercise such voting rights, and if a principal purpose of the arrangement is to avoid the classification of such foreign corporation as a Controlled Foreign Corporation under Section 957.

▮ 7. The parties concur and the Court concludes that the initial portion of the regulation—indicating that record ownership will be ignored if there is any agreement, express or implied that will result in the actual power being exercised by the shareholders owning stock having not more than 50 percent of the total combined voting power—is valid.

▮ 8. The second portion of the regulation provides that a corporation is a Controlled Foreign Corporation if three conditions concur *conjunctively:*

*First* There must be a separate class of stock whose percentage voting power is "substantially greater than its proportionate share of the corporate earnings."

*Second* The facts must indicate "that the shareholders of such other class of stock do not exercise their voting rights independently or fail to exercise such voting rights."

*Third* A principal purpose of the arrangement must be "to avoid the classification of such foreign corporation as a Controlled Foreign Corporation under § 957."

9. The second portion of Treasury Regulation § 1–1.957–2 constitutes a valid interpretation of voting power as used in § 957 of the Code which is consistent with the statutory requirement.

▮ 10. In applying the facts previously found to the law noted above, the Court concludes:

(a) That there was an implied agreement between the management of Koehring and the management of Newton-Chambers that the 55 percent of the combined voting power acquired by the Newton-Chambers group with its eight percent preferred shares would not be voted, or would be voted in accordance with the desires of Koehring.

(b) That the eight percent preferred shares acquired by Newton-Chambers was a separate class of stock whose percentage voting power was substantially greater than its proportionate share of the corporate earnings.

(c) That the Newton-Chambers group, as shareholders of such other class of stock both failed to exercise their voting rights, and on the few occasions which they did exercise them, did not exercise such rights independently.

(d) That a principal purpose of the arrangement was to avoid the classification of Koehring Overseas Corporation as a Controlled Foreign Corporation under § 957.

11. That the plaintiff herein has failed to sustain its burden of proof to establish by a preponderance of the evidence that KOS was not during its fiscal year ending November 30, 1964 a Controlled Foreign Corporation under § 957 as determined by the Internal Revenue Service.

In accordance with these Findings of Fact and Conclusions of Law, it is ORDERED that the action is dismissed and the plaintiff take nothing; further that said dismissal is on the merits and with costs.

Let Judgment be entered accordingly.